CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

FEB 10 2017

JULIA C. DUDLEY, CLERK
BY: /s/
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ENCOMPASS INDEPENDENT INSURANCE COMPANY, | ) ) ) |
| Plaintiff/Counterdefendant, | ) Civil Action No. 7:16CV00272 ) |
| v. | ) ) |
| TANYA N. DOMBROSKY, | ) **MEMORANDUM OPINION** ) |
| Defendant/Crossdefendant | ) ) By: Hon. Glen E. Conrad |
| v. | ) Chief United States District Judge ) |
| MATTHEW T. GREEN | ) ) |
| Defendant/Crossclaimant/ Counterclaimant | ) ) ) |

In this insurance coverage dispute, Encompass Independent Insurance Company ("Encompass") seeks a declaratory judgment that it has no obligation to defend or indemnify Tanya Dombrosky ("Dombrosky") in connection with a personal injury action that Matthew Green ("Green") filed against Dombrosky in Virginia state court. The case is presently before the court on cross-motions for partial summary judgment filed by Encompass, Dombrosky, and Green. For the reasons set forth below, each motion will be granted in part and denied in part.

## Background

### I. Statement of Facts

The facts in this case are not heavily disputed. In 2007, Dombrosky and her mother, Jo Ann Dunn ("Jo Ann"), moved in with Dombrosky's grandparents, Betty Dunn ("Betty") and Joe Dunn ("Joe"). At that time, Joe, who had a career in insurance, emailed a representative from Encompass inquiring about their existing policies. Jo Ann Dep. 45:15-46:23. Joe received an email stating, "According to Policy definitions the daughter/granddaughter are considered family

members/resident relatives and therefore coverage will extend to them as long as they are residing in the household at the time of a loss." Email from RMC-East to Peggy Pettrey, Wed. Oct. 31, 2007, Docket No. 17-5. Joe gave the email chain to Jo Ann, told Jo Ann that she and Dombrosky were covered, and told Jo Ann that she should keep the email exchange for her records. See Jo Ann Dep. 45:15-46:23. Joe passed away prior to the events giving rise to the instant dispute.

On June 5, 2015, Dombrosky and Betty visited First Team Hyundai in Roanoke, Virginia, where Betty purchased a 2013 Hyundai Veloster (the "Veloster") for Dombrosky. Betty paid the full purchase price, which included the vehicle's first oil change and a limited warranty. See Harstock Dep., Ex. 1, p. 0000069, Docket 21-4. Jo Ann picked up the Veloster from First Team Hyundai three days later, on June 8, 2015.

Over the next nine days, Betty drove the vehicle two, possibly three times. Each time she used the Veloster, she drove it to the grocery store, which was about four or five miles away. See Betty Dunn Dep. 9:3-10:2, Docket No. 21-6. Betty also paid to put gas in the car once or twice. See id. 8:9-9:2. Jo Ann put gas in the vehicle once. See Jo Ann Dep. 26:19-20, Docket No. 21-3. At some point, Jo Ann drove the Veloster to West Virginia. Betty paid for the gas used on that trip. See id. 58:6-19. When not in use, the vehicle was kept in the garage, and the keys were kept in the car. See id. 21:21-22:20.

No one felt that Betty needed permission to drive to Veloster, but Betty did inform Dombrosky of any planned use. See Jo Ann Dunn Dep. 54:2-6; Betty Dunn Dep. 29:6-8; Dombrosky Dep. 31:14-19. Despite Betty purchasing the Veloster for Dombrosky's use, and Betty considering the Veloster to be Dombrosky's vehicle, Dombrosky needed permission to drive the Veloster. See Betty Dunn Dep. 16:4-6; Jo Ann Dep. 54:13-15. Dombrosky drove the vehicle at least three times prior to the accident. See Dombrosky Dep. 19:8-22:24. In addition to

2

the Veloster, a Toyota RAV4 titled in Jo Ann's name and a Toyota Avalon titled in Betty's name were kept in the garage. See Jo Ann Dunn Dep. 13:16-22. The family considered the RAV4 to be Jo Ann's vehicle and the Avalon to be Betty's vehicle. See Betty Dunn Dep. 15:22-16:3.

On June 17, 2015, nine days after her mother picked up the Veloster from First Team Hyundai, Dombrosky was involved in a motor vehicle accident while driving the Veloster. The accident left Green permanently paralyzed from the chest down. He subsequently commenced a personal injury suit in Virginia state court, claiming $7.5 million in damages. At the time of the accident, the Veloster was titled in Jo Ann's name and insured by an USAA auto policy. When USAA paid for the totaled Veloster, Jo Ann specified that the check be paid to Betty. Id. 64:1-2.

## II. The Insurance Policies

At all times relevant, Betty maintained a $2.5 million personal umbrella policy (the "Umbrella Policy") and a $250,000 auto policy (the "Auto Policy"), which included an "Extended Non-Owned Coverage" endorsement (the "Endorsement"). The Umbrella Policy obligates Encompass to "pay damages for which a covered person becomes legally liable due to an occurrence resulting in personal injury, bodily injury, or property damage, up to the limit of liability shown in the Coverage Summary . . . ." Encompass Umbrella Policy Insuring Agreement 3, Docket No. 1-1 (emphasis omitted). The Umbrella Policy enumerated certain losses that the policy does not cover. In pertinent part, the Umbrella Policy does not cover:

> 12. Bodily injury or property damage arising out of the ownership; maintenance; use; occupancy; renting; loaning; entrusting; loading or unloading of any motor vehicle . . . , other than: . . .
>
> > e. A motor vehicle you maintain or regularly use which is:
> > (1) Owned by a family member and not shown in the Coverage Summary; or
> > (2) Furnished or available for the regular use of any family member.

3

Encompass Umbrella Policy Insuring Agreement 6 (emphasis denotes defined terms). There is no debate that Dombrosky is a "family member" or that the Veloster is a "motor vehicle" as defined by the policy.

The Auto Policy states, in relevant part:

A. We will pay damages for <u>bodily injury</u> or <u>property damage</u> for which any <u>insured</u> becomes legally responsible because of an auto accident. We will settle or defend, as we consider appropriate, any claim or suit asking for damages which are payable under the terms of this policy . . . .

B. We do not provide Liability Coverage for the ownership, maintenance or use of: . . .

    2. Any vehicle, other than <u>your covered auto</u>, which is:
        a. Owned by you; or
        b. Furnished or available for your regular use.

    3. Any vehicle, other than <u>your covered auto</u>, which is
        a. Owned by <u>any family member</u>; or
        b. Furnished or available for the regular use of a <u>family member</u>.

However, this Exclusion (**B.3**) does not apply to you while you are maintaining or <u>occupying</u> any vehicle which is:
    a. Owned by a <u>family member</u>; or
    b. Furnished or available for the regular use of a <u>family member</u>.

Personal Auto Policy 2-4, Docket No. 1-1 (emphasis denotes defined terms). "You" and "Your" means the "named insured." Id. at 1. Betty is listed as the named insured in the Coverage Summary. See Coverage Summary 1, Docket No. 1-2.

The Endorsement to the Auto Policy provides, "The Extended Non-Owned Coverage provided by this endorsement does not afford coverage . . . for any accident involving . . . a vehicle owned by a member of the same household." Extended Non-Owned Coverage Endorsement, Docket No. 1-2. The Endorsement also provides, "We will provide Liability Coverage for any vehicle, other than <u>your covered auto</u>, which is furnished or available for the

4

regular use of the named individual." Id. Finally, the endorsement states that the Auto Policy's "B.2.b. Exclusion," which excludes coverage for any vehicle furnished or available for the insured's regular use, does not preclude coverage by the Endorsement. Id.

### III. The Instant Action

After Green commenced the underlying personal injury suit, Encompass brought the instant action seeking a declaration that neither the Umbrella Policy nor the Auto Policy requires Encompass to defend or indemnify Dombrosky with respect to any claims asserted against her as a result of the accident. The declaratory judgment action is now before the court on cross-motions for summary judgment filed by Dombrosky, Green, and Encompass. Green and Dombrosky urge the court to conclude that Dombrosky is entitled to liability coverage under both policies. Encompass asks the court to declare that coverage is not owed to Dombrosky. The motions have been fully briefed and are ripe for review.

### Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a party's evidence to raise a genuine issue of material fact, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When deciding whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. Id. at 255; see also Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

"In a declaratory judgment action, an insurance carrier may appropriately move for summary judgment to determine whether it is obligated to provide coverage to an insured, where

5

... there are no material ambiguities in the policy." St. Paul Reinsurance Co. Ltd. v. Ollie's Seafood Grille and Bar, LLC, 242 F.R.D. 348, 352 (D.S.C. 2007) (citing Highlands Ins. Co. v. Gerber Prods. Co., 702 F. Supp. 109, 110 (D. Md. 1988)). In fact, "[s]ummary judgment is particularly well-suited for the resolution of insurance coverage disputes because the construction of insurance contracts is a legal question." Nationwide Mut. Ins. Co. v. Overlook, LLC, 785 F. Supp. 2d 502, 512 (E.D. Va. 2011); see also Transcontinental Ins. Co. v. RBMW, Inc., 551 S.E.2d 313, 317 (Va. 2001) ("[I]nterpretation of the provisions of an insurance contract presents a question of law . . . .").

## Discussion

### I. Applicable Law

A federal court sitting in diversity must apply the choice-of-law rules of the state in which that court is located. Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496-97 (1941); Va. Code § 38.2-313 ("All insurance contracts on or with respect to the ownership, maintenance, or use of property in this Commonwealth shall be deemed to have been made in and shall be construed in accordance with the laws of this Commonwealth."); see also Buchanan v. Doe, 431 S.E.2d 289, 291 (Va. 1993) (the law of the state in which an insurance contract is written and delivered governs its interpretation). In Virginia, "courts interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words they used in the document." Transcontinental, 551 S.E.2d at 318; see Blue Cross & Blue Shield v. Keller, 450 S.E.2d 136, 140 (Va. 1994) ("[A] court must adhere to the terms of a contract of insurance as written, if they are plain and clear and not in violation of law or inconsistent with public policy."). "Each component of an insurance contract 'should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done, so

6

as to effectuate the intention of the parties as expressed therein.'" Transcontinental, 551 S.E.2d at 318 (quoting Suggs v. The Life Ins. Co. of Virginia, 147 S.E.2d 707, 710 (Va. 1966)). Policy exclusions are likewise construed according to their plain language. See TravCo Ins. Co. v. Ward, 736 S.E.2d 321, 329 (Va. 2012).

Because insurers generally draft policy language themselves without any input from the insured, any ambiguities in that language are generally resolved in favor of the insured:

> [Courts find] in favor of that interpretation which grants coverage, rather than that which withholds it. Where two constructions are equally possible, that most favorable to the insured will be adopted. Language in a policy purporting to exclude certain events from coverage will be construed mostly strongly against the insurer.

Id. (quoting PBM Nutritionals, LLC v. Lexington Ins. Co., 724 S.E.2d 707, 713 (Va. 2012)). "A policy provision is ambiguous when, in context, it is capable of more than one reasonable meaning." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 636 (4th Cir. 2005). Nonetheless, "courts must not strain to find ambiguities." Id. "Contractual provisions are not ambiguous merely because the parties disagree about their meaning." Nextel WIP Lease Corp. v. Saunders, 666 S.E.2d 317, 321 (Va. 2008).

With this legal framework in mind, the court will now consider whether Encompass must defend or indemnify Dombrosky in the underlying state court action. The court will first examine Encompass' obligations under the Umbrella Policy, and then turn to its duties under the Auto Policy and the Endorsement.

## II. Coverage under the Umbrella Policy

In general terms, the Umbrella Policy excludes coverage for any bodily injury or property damage arising out of the "ownership; maintenance; use; occupancy; . . . of any motor vehicle . . . ." The Umbrella Policy then excepts from this exclusion bodily injury and property damage arising from an accident involving a vehicle that is (1) maintained or regularly used by the

7

named insured; and (2) is either owned by a family member or available for the regular use of a family member. See Encompass Umbrella Policy Insuring Agreement 6 (emphasis omitted). Accordingly, the Umbrella Policy will require Encompass to defend or indemnify Dombrosky if Betty maintained or regularly used the Veloster and the Veloster was either owned by Jo Ann or Dombrosky or available for either Jo Ann or Dombrosky's regular use.

In Virginia, the person to whom a vehicle is titled is the owner. Hall Inc. v. Empire Fire & Marine Ins. Co., 448 S.E.2d 633, 635 (Va. 1994) ("The owner of an automobile is the party who has legal title to it.") (citing Va. Code § 46.2-100). Here, the Veloster was titled in Jo Ann's name. At the time, Jo Ann was a family member as defined by the Umbrella Policy. Accordingly, the Veloster was "owned" by a family member as contemplated by the policy. Therefore, the court believes that the dispositive issue is the meaning of the word "maintain."

Notably, in the nine days between the purchase of the vehicle and the accident, the Veloster had no repair needs and was not sent to an auto shop. In those nine days, however, Betty filled up the gas tank at least once, and, when not in use, the Veloster remained in the garage of the home Betty owned. Further, the purchase price of the Veloster, which Betty paid, included a coupon for an oil change in addition to a limited warranty. Thus, Dombrosky and Green urge the court to find that Betty maintained the Veloster, which would give rise to a duty to defend or indemnify under the Umbrella Policy.

Encompass argues that the meaning of the word "maintain" must be understood as in relation to a motor vehicle. See State Farm Mut. Auto. Ins. Co. v. Powell, 318 S.E.2d 393, 397 (Va. 1984) ("[T]he 'ownership, maintenance, or use' provision should be construed in the light of the subject matter with which the parties are dealing; the terms of the policy should be given their natural and ordinary meaning."). Therefore, Encompass contends, "maintain" must mean

8

"maintenance," such as state inspections, tire rotations, oil changes, and the like. Encompass claims that the word should not be understood to mean merely garaging and fueling.

Few courts have addressed the issue of what constitutes maintenance of a motor vehicle. Green and Dombrosky rely on a case in which the United States Court of Appeals for the Fourth Circuit addressed the meaning of "maintain" in relation to an automatic sprinkler system. See Breton, LLC v. Graphic Arts Mut. Ins. Co., 446 F. App'x 598, 602-03 (4th Cir. 2011). Citing to Black's Law Dictionary, the Fourth Circuit concluded that the word "maintain" could be understood in more than one way. Id. It could reasonably be interpreted to mean having a regular repair obligation. Id. On the other hand, "maintain" could also reasonably be understood to mean that the insured simply had to have a sprinkler system installed, as in to keep it in existence. Id. The Fourth Circuit believed these two understandings supported a finding of ambiguity, requiring it to apply an interpretation that would effectuate coverage. See id. (citing Mollenauer v. Nationwide Mut. Ins. Co., 198 S.E.2d 591, 592 (Va. 1973)).

Green and Dombrosky also point to a handful of out-of-circuit state-court decisions that have addressed the issue of what it means to "maintain" a vehicle. For example, the Supreme Court of Pennsylvania has determined that maintenance "means to preserve or keep in an existing state or condition and embraces acts of repair and other acts to prevent a decline, lapse, or cessation from that state or condition." Morris v. Am. Liab. & Surety Co., 185 A. 201, 202 (Pa. 1936). Adopting this language, the Supreme Court of Texas found it "inescapable that the replacement of fuel which has been exhausted with use and without which a motor vehicle is inoperative, is a species of maintenance . . . ." State Farm Mut. Auto. Ins. Co. v. Pan Am. Ins. Co., 437 S.W.2d 542, 545 (Tex. 1969). Finally, Green and Dombrosky note that the dictionary

9

meaning of the word means: "1. to keep in a state of repair, efficiency or validity: preserve from failure or decline . . . 4. to provide for: bear the expense of: support . . . ." Webster's Third New Int'l Dictionary 1362 (1986).

Like in Breton, the court believes that the parties proffer two different and reasonable understandings of the word "maintain." This suggests that the term is ambiguous. See Breton, 446 F. App'x at 603 ("[T]he word 'maintain' 'may be understood in more than one way,' which supports a finding of ambiguity.") (citing Salzi v. Va. Farm Bureau Mut. Ins. Co., 556 S.E.2d 758, 760 (Va. 2002)). Moreover, while the Umbrella Policy, and this provision in particular, is ripe with defined terms, Encompass declined to define "maintain" in the agreement. See id. ("Absent any clarification in the policy, we conclude that 'maintain' is ambiguous here."). Accordingly, the court is bound by Virginia law to interpret the term in favor of coverage. See TravCo, 736 S.E.2d at 329 ("Where two constructions are equally possible, that most favorable to the insured will be adopted.")

With these principles in mind, the court believes that Betty maintained the Veloster for purposes of the Umbrella Policy. Testimony demonstrates that the Veloster stayed in the garage when not being used, sheltering it from the elements. Moreover, this decision to keep the Veloster in the garage was an affirmative one, as Betty testified that at least one vehicle was kept on the driveway. See Betty Dunn Dep. 29:34-30:2. Betty and Jo Ann both stated that keeping the Veloster in the garage helped to secure the Veloster and protect it from adverse weather. See Betty Dunn Dep. 31:10-21 (attributing the reason her Toyota Avalon was in "excellent shape" to be because it was kept in the garage); Jo Ann Dunn Dep. 22:21-23; 61:4-15. Similarly, the court believes that garaging the vehicle involved caring for the Veloster "for purposes of . . . appearance." Black's Law Dictionary 1039 (9th ed. 2009). Furthermore, Betty did more than just

10

garage the Veloster. She fueled the car at least once, and Betty paid for fuel when Jo Ann drove the Veloster to West Virginia. See Webster's Third New Int'l Dictionary 1362 (1986) (defining maintain as "to provide for: bear the expense of"). Additionally, the purchase price of the vehicle, which Betty paid, included the first oil change and a limited warranty.

It also appears that Dombrosky, Jo Ann, and Betty expected Betty to contribute to certain upkeep expenses, such as oil changes and tire rotations. For example, Betty and Joe had contributed towards these expenses for Jo Ann's RAV4. See Jo Ann Dunn Dep. 52:9-10; Betty Dunn Dep. 20:9-11. Betty had previously purchased a vehicle for another granddaughter. She had purchased tires, windshield wipers, and gasoline for that vehicle. See Betty Dunn Dep. 27:6-9. Betty also acknowledged that Dombrosky did not have sufficient funds to pay for these sorts of expenses, and she expected to help Jo Ann cover them. See id. 32:4-17. For these reasons, the court believes that Betty's actions amounted to "maintaining" the Veloster. Consequently, according to the language of the Umbrella policy, Encompass has a duty to defend or indemnify Dombrosky. See Encompass Umbrella Policy Insuring Agreement 6.

### III. Coverage under the Auto Policy

Green and Dombrosky also ask the court to declare that Encompass has a duty to defend or indemnify Dombrosky pursuant to the terms of the Auto Policy, the Endorsement, or both. Encompass seeks a declaration that it has no such duty. The Auto Policy excludes coverage for "[a]ny vehicle, other than your covered auto, which is: . . . furnished or available or your regular use." Personal Auto Policy 4. The Endorsement carves out an exception to this exclusion, stating that Encompass "will provide Liability Coverage for any vehicle, other than your covered auto, which is furnished or available for the regular use of the named individual." Extended Non-Owned Coverage 1. However, there is a relevant exception to the Endorsement coverage: "The

11

Extended Non-Owned Coverage provided by [the] endorsement does not afford coverage . . . for any accident involving: . . . a vehicle owned by a member of the same household." Id.

As a threshold matter, Encompass argues that the Endorsement does not apply because the Schedule listed on the Endorsement does not list a "named individual." "Each component of an insurance contract 'should be considered and construed together . . . .'" Transcontinental, 551 S.E.2d at 318 (quoting Suggs v. The Life Ins. Co. of Virginia, 147 S.E.2d 707, 710 (Va. 1966)). Thus, endorsements that modify an underlying policy "should be considered and construed" in conjunction with said underlying policy. Suggs, 147 S.E.2d at 710. "[W]here there is doubt as to [the] meaning," the court is constrained to construe the language "in favor of that interpretation which grants coverage, rather than that which withholds it." St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co., Inc., 316 S.E.2d 734, 736 (Va. 1984).

Looking at the Endorsement independently and to the Auto Policy collectively, the court believes that the parties intended Betty to be the "named individual." See Seals v. Erie Ins. Exch., 674 S.E.2d 860, 862 (Va. 2009) ("Each phrase and clause of an insurance contract should be considered and construed together . . . so as to effectuate the intention of the parties as expressed therein."). On the Coverage Summary, Betty is listed as the "named insured." Additionally, in relation to the Auto Policy, Betty is listed under "Driver Information." See Coverage Summary 1, Docket No. 1-2. Similarly, the Coverage Summary notes that the Auto Policy is "subject" to the Endorsement. Id. at 4. Furthermore, while Encompass is correct that no one is specifically listed as the "named individual" on the Schedule for the Endorsement, there is an "X" next to "Named Individual and Family Members." Next to "Total Premium" on the same schedule is "$ INCLUDED." See Extended Non-Owned Coverage 1. Accordingly, the court believes that Endorsement is applicable and that the relevant question is whether the Endorsement provides coverage.

12

In <u>State Farm Mut. Auto. Ins. Co. v. Jones</u>, 383 S.E.2d 734 (Va. 1989), the Supreme Court of Virginia had the opportunity to examine the meaning of "furnished or available for the regular use" in the context of an automobile insurance policy. Specifically, the Court reevaluated an earlier decision, <u>State Farm Mut. Auto. v. Smith</u>, 142 S.E.2d 562 (Va. 1965), in which it had determined that the vehicle in question was not furnished or available for regular use of the insured. The Court observed that <u>Smith</u> "emphasized that [the insured] exercised no dominion or control over the car and never operated it for any purpose without first obtaining permission." <u>Jones</u>, 383 S.E.2d at 735; see also <u>Hetrick v. Gov't Emps. Ins. Co.</u>, No. 97659, 1991 WL 11015422, at *1 (Va. Cir. Ct. May 9, 1991) ("The classification of the character of use was specifically abandoned in <u>Jones</u>, where the Court instead urged that it is control (for whatever purpose) that is determinative of 'regular use.'"). The facts in <u>Jones</u> compelled, however, the Court to come to a different conclusion. In <u>Jones</u>, the Supreme Court of Virginia determined that the insured had demonstrated such "frequent, daily, and extensive use, dominion, and control of the [vehicle]" that the vehicle was considered to be furnished or available for regular use of the individual. <u>Jones</u>, 383 S.E.2d at 736.

Other state courts within the Fourth Circuit have also addressed whether an automobile is "furnished or available for the regular use" of an individual. For example, in <u>American States Ins. Co. v. Tanner</u>, 563 S.E.2d 825 (W. Va. 2002), the Supreme Court of Appeals of West Virginia noted:

> The phrase "furnished for regular use". . . does not imply the manner of use, that is, putting the automobile to the same uses to which an insured would use his own automobile, but implies a <u>right to the regular use</u> of the automobile in the sense that there is an expressed or implied understanding with the owner of an automobile that the insured could have the use of the particular automobile . . . if available.

<u>Id.</u> at 831 (emphasis added); see also <u>Nationwide Mut. Ins. Co. v. Shoemaker</u>, 965 F. Supp. 700, 706 (E.D. Pa. 1997), <u>aff'd</u>, 139 F.3d 1165 (3d Cir. 1998) (observing that "indicia of regular use

13

[include]: (1) blanket permission to use the car rather than having to request permission each time and (2) an available set of keys").

In the instant case, Betty drove the Veloster two to three times in the nine days the family possessed the car prior to the accident. No one believed that Betty had to ask permission to use the Veloster, if it was available. Jo Ann Dunn Dep. 54:2-6; Betty Dunn Dep. 29:6-8; Dombrosky Dep. 31:14-19. Moreover, the keys were kept inside the Veloster—not with Dombrosky. Jo Ann Dunn Dep. 22:12-20; Dombrosky Dep. 24:16-17. Additionally, there were no restrictions on what Betty could do with the Veloster. Betty Dunn Dep. 29:9-13.

The court believes these facts are sufficient to establish that the Veloster was available for Betty's regular use. As the Supreme Court of Virginia has emphasized, dominion and control over the vehicle are important factors in determining whether a vehicle is available for regular use. See Jones, 383 S.E.2d at 735. Betty also clearly had "(1) blanket permission to use the car rather than having to request permission each time and (2) an available set of keys" as the keys were left in the Veloster. Shoemaker, 965 F. Supp. at 706. Thus, the Auto Policy provision that excludes coverage for "any vehicle, other than your covered auto, which is: . . . furnished or available or your regular use" applies. Personal Auto Policy 4. Additionally, the Endorsement provision which provides and exception to this exclusion is also applicable. See Extended Non-Owned Coverage 1.

Encompass, however, points out that the Endorsement "does not afford coverage . . . for any accident involving . . . a vehicle owned by a member of the same household." Id. Jo Ann owned the Veloster and lives with Betty. This exclusion appears to apply. However, Dombrosky and Green urge the court to find that this exclusion, read in context with the entire Endorsement, creates a conflict that must be resolved in favor of the insured.

14

"An exception that serves to negate the applicability of one particular exclusion does not create a 'conflict' with another policy exclusion . . . ." PBM Nutritionals, 724 S.E.2d at 713. "An exception to an exclusion only has bearing on that exclusion's applicability." Id. In short, "an exception to an exclusion does not create coverage where none exists." Id. (citing Nationwide Mut. Ins. Co. v. Wenger, 278 S.E.2d 874, 876 (Va. 1981)).

In the instant case, the court cannot find a conflict between the Endorsement provisions. On the one hand, the Endorsement carves out an exception to the Auto Policy exclusion for vehicles furnished or available for Betty's regular use. See Extended Non-Owned Coverage 1. On the other hand, the Endorsement does not provide coverage for an accident involving a vehicle owned by a member of the same household. Consequently, despite the Endorsement's exception to the relevant Auto Policy exclusion, the exception cannot "create coverage where none exists." PBM Nutritionals, 724 S.E.2d at 713. The Endorsement unambiguously excludes coverage for accidents involving vehicles owned by family members.

"An insurance company bases its policy and premium on its evaluation of the frequency and opportunity for a risk to produce a loss." Jones, 383 S.E.2d at 469. The risk will obviously grow when a vehicle available for the regular use of the insured is owned by someone who lives in the same household. Further, it is a risk that the Endorsement clearly hedges through the relevant coverage exclusions. See Extended Non-Owned Coverage 1 ("The Extended Non-Owned Coverage provided by this endorsement does not afford coverage . . . for any accident involving: . . . a vehicle owned by a member of the same household."). Therefore, the court concludes that Encompass is not required to defend or indemnify Dombrosky pursuant to the Auto Policy or its Endorsement.

Green and Dombrosky contend that even if the terms of the policy do not provide coverage, Encompass is estopped from denying coverage. "A person is estopped from denying

15

the consequences of his conduct where that conduct has been such as to induce another to change his position in good faith or such that a reasonable man would rely upon the representations made." Humble Oil & Ref. Co. v. Fidelity & Cas. Co., 402 F.2d 893, 898 (4th Cir. 1968). Dombrosky and Green believe that the emails between Joe and Encompass unequivocally show that Encompass affirmatively represented to its named insured that Dombrosky, a resident relative, had coverage under the policy. Moreover, Dombrosky urges that reliance is demonstrated because Joe instructed Jo Ann to keep the email chain and told Jo Ann that she and Dombrosky were covered.

Encompass asserts that it is not estopped from denying coverage because "coverage of an insurance contract may not be extended by estoppel or implied waiver to include risks expressly excluded." Sharp v. Richmond Life Ins. Co., 183 S.E.2d 132, 135 (Va. 1971). This rule has precluded coverage in cases in which the insurance companies went so far as filing a form stating that its "policy was in force and effect and covered the driver." See Mulvey Const., Inc. v. Bituminous Cas. Corp., 571 F. App'x 150, 158 (4th Cir. 2014) (discussing Norman v. Ins. Co. of N. Am., 239 S.E.2d 902, 908 (Va. 1979)). The Fourth Circuit upheld a district court's denial of extending coverage under the doctrine of estoppel even when certificates of insurance stating that third parties were added as additional insureds were issued despite the fact that the third parties were never actually added to the underlying insurance policy. See id. at 158-60 (holding "that the district court did not err in refusing to apply estoppel to extend this insurance policy's coverage beyond its terms"). As discussed, the Endorsement excludes coverage for accidents involving a vehicle owned by a member of the same household. See Extended Non-Owned Coverage 1. Accordingly, the court may not "extend by estoppel . . . [these] risks expressly excluded." Sharp, 183 S.E.2d at 135. Therefore, Encompass is not estopped from denying

16

coverage under the Auto Policy and Endorsement. The court will thus grant in part and deny in part Dombrosky and Green's motions and grant in part and deny in part Encompass' motion.

## Conclusion

For the reasons stated, Dombrosky and Green's motions for summary judgment will be granted in part and denied in part. Encompass' motion will be granted in part and denied in part. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record. The Clerk is further directed to close this matter and strike it from the active docket of the court.

DATED: This 10th day of February, 2017.

/s/ Glen Conrad
Chief United States District Judge